IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA

VEN CHIANG and MARIA CHIANG,

Plaintiffs,

vs. CIVIL ACTION FILE NO.:
7:25-CV-00106-WLS

STATE FARM FIRE AND
CASUALTY COMPANY, a foreign
for profit corporation,

Defendant.
~~~~~~~~~~~~~~~~~~~~~~~

REMOTE DEPOSITION OF
WILLIAM MELTON

July 1st, 2026
12:01 p.m.

(All attendees appeared remotely via
videoconferencing and/or teleconferencing.)

Rachel Tucker, CCR
GA 5942-2349-4227-5584
~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES OF COUNSEL

ON BEHALF OF THE PLAINTIFFS:

KAI THOMPSON, Esquire
Kai P. Thompson, PA
7900 Northwest 27th Avenue, Suite E241
Miami, Florida 33147
T: (786) 778-4986
E: kai@kpt-pa.com

ON BEHALF OF THE DEFENDANT:

MATTHEW DAY, Esquire
Young, Thagard, Hoffman, LLP
2841 North Patterson Street
Valdosta, Georgia 31602
E: matthewday@youngthagard.com
T: (229) 242-2520

ALSO PRESENT:

Jillian Hanna

--oOo--

INDEX TO EXAMINATION

| | PAGE |
|---|---|
| Examination by Mr. Day | 4 |
| Examination by Mr. Thompson | 51 |

INDEX OF EXHIBITS

| DEFENDANT'S | | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena | 11 |
| Exhibit 2 | Curriculum Vitae | 21 |
| Exhibit 3 | Bryant Roofing Report | 29 |
| PLAINTIFFS' | | |
| Exhibit 1 | Video | 51 |

(Original Defendant's Exhibits 1 through 3 and Plaintiffs' Exhibit 1 have been attached to the original transcript.)

--oOo--

Remote Deposition of William Melton
July 1st, 2026

WILLIAM MELTON

The witness, having been first duly sworn (affirmed), was examined, and testified as follows:

MR. DAY: All right. Good morning, everybody. Or good afternoon now. This will be the deposition of William Michael Melton, Jr., taken pursuant to notice and by agreement of counsel for all purposes allowed under the Federal Rules of Practice and Federal Rules of Evidence.

Counselor, can we agree to withhold all objections except to the form of the question and responsiveness of the answer until the first use of the deposition transcript?

MR. THOMPSON: Agreed.

MR. DAY: Thank you.

EXAMINATION

BY MR. DAY:

**Q. Well, again, good morning, Mr. Melton. As it says here, my name is Matthew Day. I'm here on behalf of the defendant just to ask you**

a couple of questions. You were involved in this claim, and we just want to make sure we understand you and your opinion on this a little bit better.

First question -- one of those lawyer questions, where I ask the question, and I know you know the answer to it -- have you done a deposition before?

A. No, sir.

Q. All right. We'll go over a few housekeeping matters just so we can make sure today's deposition goes smoothly for us.

The first thing is we have a court reporter here taking down my questions and your answers. We want to make sure that everything you say is taken down correctly. One of the ways we can do that is by avoid talking over each other.

This is pretty conversational, and are probably going to know where my questions are going before I get there. I just ask you let me to -- an opportunity to fully ask my question before you try and respond. I'll try to return the same courtesy. I'll tell you right now, Mr. Melton, I am terrible about trying to move

on with my next question before you're done responding. If at any point in time I start to cut you off, don't let me stop you. You just keep going and make sure you fully respond.

Additionally, we can see each other on Zoom, you know. We know what we're talking about. Certain things, though, still need to be verbalized. For example, head nods don't work for us. Pointing. You know, the fish was this (indicating) big. Gestures like that don't show up on a transcript. So I might follow up with is that a yes, is that a no, are you referring to this area, just to make sure that we are properly designating what you're saying.

Additionally, if at any point in time either I or the court reporter or Mr. Thompson say is that a yes or is that a no, we're not trying to be rude or pick at you. We just want to make sure you -- your response is taken down correctly.

Additionally, as we are on Zoom and I'm running on a couple of cuffs -- couple of cups of coffee today, you'll hear me stammering some. If at any point in time you don't understand my question, the call breaks up, I'm mumbling,

talking too fast, whatever the case might be, please let me know. I'd be more than happy to repeat myself, restate it, rephrase it, whatever you need so that you understand my question.

If you respond to my questions, is it fair to assume that you understood them?

A. What now?

Q. Oh. If you respond to my questions, is it fair to say that you understood them?

A. Yes.

Q. Thank you, sir. Additionally, I don't think we'll be here too long today, but if at any point in time you need to stretch your legs, get some water, use the restroom, anything like that, you're more than welcome to do so. I would just ask that if I've asked you question that we respond to that question before we take that break. Is that agreeable?

A. (Witness nods head.)

Q. And I saw you verb -- I see you speaking. I didn't hear you, though. Is that a yes?

A. Yes, yes.

Q. Thank you, sir. Sometimes --

A. I'm sorry. I don't have a mic, so I'm

just -- I may need to speak up a little bit on my end. Sorry about that.

**Q. Yes, sir. Not a problem.**

**Additionally, throughout today's deposition, we're going to be referring to a property. To confirm, did you perform an inspection of a property belonging to Mr. and Mrs. Chiang? Is that correct?**

A. Yes, sir.

**Q. For our references, I'll keep referring to the property, the home, the abode, dwelling, whatever it might be. That's what we're referring to just for purposes of our conversation and today's record unless we specify otherwise.**

**Additionally, do you have any impairments which would prevent you from understanding my questions or responsive -- or responding to them fully today?**

A. No, sir.

**Q. Are you under the influence of any medication, alcohol, or other substances which would impair your ability to understand my questions or respond to them fully and truthfully today?**

A. No, sir.

**Q. And is there any medication you did not take which you ordinarily take which might impair your ability to understand my questions and respond to them fully and truthfully today?**

A. No.

**Q. And those are no sirs?**

A. Yes. No sirs.

**Q. And I can see you speaking. I'm catching the --**

(Simultaneous speakers.)

A. Let me scoot up here a little closer to the -- I don't have a mic, so I'm trying to go off my -- it's on my desktop here so... Is that better? Can you hear me better now?

**Q. Yes, sir. And it was just the first word wasn't catching each time. That was all.**

**All right. Start you off with a nice tough one here. What is your full name?**

A. My name is William Michael Melton, Jr.

**Q. And what is your date of birth?**

A. 2/23/79.

**Q. All right. I'm going to share my screen here. Let me know if you can see this. Can you see my screen okay?**

A. Yeah.
**Q. And I'll try and zoom in a little bit for us.**
A. Yeah. I can see it.
**Q. All right. I'll represent this was a subpoena to testify in this action. Have you seen this document before?**
A. Yes. That's the document that you sent to me.
THE WITNESS: Is that correct, Kai?
MR. THOMPSON: I can't testify. You've got to do it as best you can, but yeah. It looks like what you should have gotten.
A. I'm pretty sure it's the same. It looks like the same one that they sent over to me.
**Q. Yes, sir. And, again, I told you I was going to try and step on your toes today, but don't let me cut you off.**
**I'll represent we sent over this document to Mr. Thompson in the interest that he may forward it to you. And I'll show specifically, attached to this document was a list of documents we've requested.**
**Did you bring any additional**

**documentation with you today?**

A. I just have -- well, I have my report and the photos, and that was pretty much it. I didn't really have any -- any other reports or anything. I didn't -- you know, the only thing that I had about it was, you know, what I had when I we went over there, I guess. Like, I didn't have any other -- any other documents other than what I provided.

**Q. Yes, sir. And one thing in specific. Were any videos taken during the inspection?**

A. Yes, sir. I sent them over to Kai, and I assume he sent them over to you.

**Q. Thanks.**

MR. THOMPSON: And I'll say I did. Those were produced as part of our discovery.

MR. DAY: Yes, sir. Just making sure everything was produced.

**Q. (By Mr. Day) All right. We'll mark this as Defendant's Exhibit Number 1.**

(Defendant's Exhibit Number 1 was marked for identification.)

**Q. Do you understand that your testimony is being provided pursuant to the subpoena and**

**under oath today?**

A. I do.

**Q. And do you understand that your testimony holds the same weight as if you were testifying in front of a jury?**

A. I do.

**Q. All right. Are you currently employed?**

A. I am.

**Q. And where are you employed at?**

A. I work for a roofing company in Valdosta, Georgia. Bryant Roofing. I'm the sales manager over here.

**Q. And what's the address for this business?**

A. It is 1732 Dow Street, Valdosta, Georgia, and I believe it's 31601.

**Q. And that's something I meant to go over earlier. We're here to ask you about what you can recall. If at any point in time you're not sure, you know -- for example a specific number or an exact date in time -- generally we can be pretty forgiving in that. We just want to make sure we can qualify those responses, though. We don't want you guessing at anything. It's just what you can recall. But let's say we have a --**

**I think it was the beginning of April. As long as you qualify those statements, we should be fine. We'll take a ballpark most of the time.**

**All right. How long have you been with Bryant Roofing?**

A. For right at three years. Or just under three years. Yeah.

**Q. Have you held any other title or position other than sales manager?**

A. Sales rep and project manager. I still kind of do all of that now, but... But my main title now is sales manager.

**Q. All right. Have you worked at any other roofing companies before working with Bryant Roofing?**

A. No, sir.

**Q. Any other construction companies before Bryant Roofing?**

A. I worked for, like, pipelining, construction companies, and stuff like that welding. But no, not any other, like, residential or -- not like building. I did a lot of pipeline stuff building. Did a lot of welding and stuff in my younger days.

**Q. And was that in a sales position, or**

**were you actually putting the rod to the steel?**
A. Yeah. Actually doing the welding, and then I moved more into the inspection side of it. So that's kind of where my inspection started.
Well, I worked for a railroad company, and I did -- they had me certified in all kinds of nondestructive testing and, like, coating -- coating inspections. Stuff like that.
**Q. And the railroad certifications, was that mainly related to the welding aspect?**
A. Yeah. I did a lot of the welding inspections, but then they also had me certified to do coatings for -- we did the, like, high-pressure vessels, the interior coating and stuff like that for the tank cars for the DOT.
**Q. Okay. So you're the -- you're the man that makes sure it doesn't go boom when it's rolling down the tracks?**
A. Yeah. Exactly. Yeah. Yeah. My name's -- my name is on some pretty important documents over there, so yeah.
(Simultaneous speakers.)
A. Hazardous material stuff.
**Q. Yes, sir. So what brought you into the**

**roofing aspect?**
A. I don't know. I just kind of -- a friend of mine had a -- you know, he had a roofing company and all, and he had been asking me to come work with him, and I decided to give it a shot. Just kind of fell into it. But mainly because I was -- my inspection experience kind of one of the -- one of the main reasons he wanted me to come on.
**Q. And you mentioned you're a sales manager with the company. Do you do any of the actual construction or repairs on the roof yourself?**
A. Not really. Well, I do some, like, smaller repairs sometimes. If they're, you know -- if they're -- if it's repairable, I can do some small repairs. But mainly, no. I just mainly do inspections and sign to get the contracts and all signed and then oversee the projects, order materials. You know, all the back end stuff. Supplement the claims and so forth.
MR. DAY: And can we go off the record for just a second?
(Discussion off the record.)
MR. DAY: Back on the record.

**Q. (By Mr. Day) All right. What geographical area does Bryant Roofing typically service or work in?**

A. So mainly, you know, South Georgia to the Florida line. And then now we have another office up around the Macon area. So from like below Atlanta south pretty much and from Savannah across. So maybe Columbus and then down to the Florida and Alabama line down there.

**Q. And do you do any work in Florida?**

A. Not yet. We're -- we're working on getting our Florida license, but we're not certified down there yet so...

**Q. Do you know how many employees are with Bryant Roofing?**

A. I think we got six or seven sales reps. We got a couple project managers, then the owner, our office manager. I don't know. 10, 11 maybe. I can't -- I can't recall right off the top of my head, but somewhere around there.

**Q. And does Bryant Roofing actually provide the repair/replacement services, or are you more of a -- not calling you the middleman, but a sales position?**

A. Oh, no. We -- you know, we sell. We do

the whole -- from front to back. We actually do the roofs and everything too.

**Q. Do you have an idea of how many projects you've worked on this year or how many roofs you've inspected?**

A. Me --

**Q. And we'll take a ballpark.**

A. -- personally or the -- as a company?

**Q. Just you.**

A. I don't know. Probably several hundred.

**Q. Do you mainly do residential or commercial?**

A. Both. More -- probably more residential right now, but we are pushing more into the commercial side.

**Q. We talked a little bit earlier about some of your certifications. I'll ask generally. What's your highest level of education?**

A. I have some technical college, but that's about it.

**Q. Where'd you go to college at?**

A. It was -- I think it was Wiregrass, Wiregrass Technical College.

**Q. And did you graduate from Wiregrass?**

A. Did not.
**Q. What were you going to Wiregrass for?**
A. Welding. Like --
**Q. And what sort of certifications do you hold pertaining to construction or roofing?**
A. So the only actual certification I have is the repairabilities -- the asphalt shingle repairability assessment and then just hands-on experience is the rest of it.
**Q. Now, do you have any particular licenses or other qualifications concerning roofing or construction?**
A. (No response.)
**Q. Can you hear me?**
A. Can you hear? No, sir.
**Q. Oh, yes, sir. Sorry. I didn't catch that. All right. Doing your roofing work or repairs or repairability assessments, what sort of guidelines or standards do you reference?**
A. So the Building Expert Institute that I obtained the certification from, they have a written practice of exactly how and what steps and everything of how to set it up, what to do, and how to document it.
**Q. And specifically, are there any, like,**

**industry manuals or guidelines or publications or papers you reference?**

A. Yes. And I can't think of the actual -- it's in the -- I don't remember exactly what -- what it was written in. Not off the top of my head, but there's an actual written practice in some -- in one of them -- I can't -- I'm sorry. I cannot remember where it came from, but there is a written practice somewhere.

**Q. Appreciate that. I'll interject and say that I think there was reference to any -- one reference in the documents you provided to us. And so were there any other besides the one included in the documents you provided?**

A. Not that I know of.

**Q. Do you do anything to educate yourself on current industry standards of practices?**

A. Oh, yeah. We -- I just -- I always try to stay in the new products. You know, we -- just different practices. You know, I try to keep up with it just -- just by reading Internet -- you know, just try to stay up with the newest things, you know.

**Q. Do you know if there are any additional education or training programs out there which**

**address the field of roof repairability?**
A. I don't know off the top of my head, but I believe that there are some other -- there are some other practices, I think.
**Q. How do you have assignments come into -- well, to you specifically?**
A. Like how do I -- like leads coming in, or like --
**Q. Yes, sir.**
A. -- how I get -- yeah. Mostly from Google, word of mouth referrals. I actually have -- I -- I've been called by insurance agents. Work with a lot of insurance agents in the area. Matter of fact, even State Farm themselves put us on their preferred vendor list.
**Q. Have you worked with attorneys before?**
A. I have not.
**Q. I'll preface that. Providing opinions for assessments for attorneys?**
A. Not for attorneys, but I have for in -- some insurance adjusters.
**Q. Have you entered into a contract with the property owners?**
A. On this one?

**Q. Yes, sir.**
A. No. I -- I don't have any -- I don't have any ties to this other than me doing this assessment.
**Q. Let's see if I can share my screen here. And I believe I previously mentioned it, but in case I didn't, we'll mark the subpoena as Defendant's Exhibit Number 1. Share my screen. We'll note this as Defendant's Exhibit Number 2.**
(Defendant's Exhibit Number 2 was marked for identification.)
MR. THOMPSON: Counsel, you were doing "A" and "B" before. I don't know if you want to stick with that or switch.
MR. DAY: This'll work for me. We'll -- we'll keep them "A" and "B." Well, actually, I think I referenced the -- Exhibit A which was attached to the subpoena.
MR. THOMPSON: Okay.
MR. DAY: But for clarity, we'll -- I guess we'll correct -- the subpoena is Exhibit 1, which has an attachment, Exhibit A, and this will be Exhibit 2.
MR. THOMPSON: Okay.

MR. DAY: I appreciate the note, though.

**Q. (By Mr. Day) Can you describe the document we're looking at here?**

A. It's my r sum .

**Q. All right. And specifically, I wanted to ask you a little bit more about the Building Expert Institute. How did you get into contact with them, or why did you select them, I'll ask.**

A. Well, really just because I -- so I'm in a lot of Facebook groups, and they -- they have a big presence on there. And the guys that run it, they just -- they -- they just seem really smart and really detailed, and so I just wanted to give them -- you know, I reached out to them, and then I signed up for one of their classes. It was very knowledgeable.

The guys there are really professional, and they -- I mean, they -- I believe the guy that ran it, his name is Chad Williams. He's the engineer that wrote the -- wrote the actual practice, and he's the one that actually does the -- does the class.

**Q. And when did you take the certification course for this?**

A. I took it back in January of this year.

**Q. What sort of study material or coursework was required for this program?**

A. They had just a lot of videos. We did a lot of hands-on. They actually brought in boards, like, they had took off of houses that, I guess, the -- they were doing. The shingles were still on them. So they would bring in these boards that would have the shingles, and we'd actually do repairability assessments on actual damaged shingles. It was actually pretty cool.

But they would bring these big boards in and -- and then they would work you through it, and we -- you know, we did it multiple times throughout the day just so you could get, you know, a good feel of the process and everything.

They pointed out the different kind of damages that would occur during an assessment, the things to look for, and then just kind of a step-by-step process. Because the thing is about the practice is it's methodical, you know. You do every one the same. That way, you know, you don't have any variations of -- you know, of how things go or, you know, I guess just a set

way to do it on every one every time. And everybody that does one of the assessments or is an assessor does it -- always does it the same way.

You know, so it's kind of a -- I guess you have a -- I don't know what to say. You know, a constant way of -- everybody doing it the same way so you don't have a bunch of different variations from person to person, you know...

**Q. All right. And how long did this certification course take?**

A. It was a -- it was a full ten-hour day, I think. We were there all day long. It was -- but it was a one-day course. And you kind of had to already know. Like, you couldn't -- you kind of had to already know what -- about the industry and about look -- you know, stuff like that before you could even -- you had to have some experience before you could get into the class, I believe.

**Q. Do you know if this is a new institution or new program here in Georgia?**

A. I don't, but I'm pretty sure that it's nationwide that they use it. I know that

because there was some people that was not from Georgia in the class. I know I've seen them -- they have some in Tennessee. Really all over.

**Q. And do you know if they have a -- like a different name or different practice here in Georgia?**

A. I do not.

**Q. And then the -- the training you attended, was that here in Georgia, or was that in Tennessee?**

A. No. It was here in Georgia in Atlanta.

**Q. And was there a exam you need to take to get the certification?**

A. Yes. Yeah.

**Q. A practical or written or both?**

A. Both.

**Q. How -- how were those tests scored?**

A. So I don't even remember how it went. I mean, I don't remember how they scored it. But it was -- I know there was a written -- a written, and then when had -- then part of the practical was actually doing -- doing a -- like I said, they did the board where we did -- actually did a hands-on assessment.

**Q. And do you recall what score was needed**

**to pass?**

A. I -- I do not. I think I made a 90-something, I think. 90 on it, I think.

**Q. Hey. An "A." We'll take it any day of the week.**

A. Yeah. That's right.

MR. DAY: All right. And we'll mark this curriculum vitae as Exhibit Number 2.

**Q. Share my screen one more time here. Okay. Can you see my screen okay?**

A. Yeah. Yes, sir.

**Q. All right. Can you describe what document we're looking at here?**

A. Yes. That's the repairability assessment. That's the actual -- that's the actual form that we fill out. I actually printed it out myself so I could have it here in front of me.

**Q. Yes, sir. And, again, one of those attorney questions. Did you prepare this report?**

A. I did. And you actually have to -- you have to prepare it online on the Building Institute's -- on their web page. You pull all

your information in there, and then they email it to you once they -- I don't know if they -- it's almost like I -- I don't know for sure, but I think that they, like -- like, something -- make sure that everything's that supposed to be in there is in there before they'll email you one back.

**Q. And we've been talking about this roof some. Can you just describe this roof in general? Like architect, three-tab? What are we looking at here?**

A. I was hoping you would ask me because it was an architectural shingle roof. You want me to go on and, like, tell you what I think, what -- like my opinion of the roof?

**Q. Well, I'll tell you what. Let me -- we'll definitely get there. Let me steer you. First I will ask, in layman's terms, what is an architectural shingle?**

A. It's a laminate shingle. So you have a three-tab, which is just one piece. An architectural is actually two pieces laminated together to give it more strength and, I guess, more of a three-dimensional -- give it a little more texture.

**Q. And do you know how old the roof was?**

A. I do not know the exact date of it, but my -- just from my looking at it, it looked like it was, you know, 20 years. 15 to 20. Maybe a little older than that.

**Q. And do you know the -- the year rating for the roof? For example, you'll have a 15-year shingle, a 30-year shingle. Do you know the rating for this roof?**

A. I do not, but -- well, I can't say -- leave it like that. I don't know exactly what it was. I don't even know what brand it was or anything.

**Q. All right. Now, that answers my next question, but I'll ask it. Did you look into seeing if there were any similar styles or colors from the same brand available?**

A. I did not. Usually, the -- you know, State Farm would have looked into that and sent them who they want to, you know, pick -- they usually will pick it out. Send -- they're supposed to send a shingle off to them and have an ITEL report. And then, you know, most of time, they'll let you -- they'll say whatever kind of shingle that comes back would be.

**Q. And, again, I'll represent looking at the second page of this document we're noting as Defendant's Exhibit Number 3.**

(Defendant's Exhibit Number 3 was marked for identification.)

**Q. Is this the property you inspected?**

A. Yes, sir.

**Q. Moving on to the third page here. Let me zoom in a little bit for us. Under -- can you see where my mouse is moving under where it says "Repairability Assessment Location" and the notes --**

A. Yep.

**Q. -- section? Says here you noted excessive granular loss. How do you quantify or determine there's excessive granular loss?**

A. I mean, it's -- it was just kind of obvious. If you'll look -- well, we can look in some of the photos in my -- if you'll go farther back in there. I actually took some pictures of it as -- just to give a general idea of, you know, what the condition of the roof was before I ever started.

You know, there was literally bald spots with fiberglass showing all over this roof. I

mean... And let's just say if there was a million granules on that roof, there's -- probably was only about 100,000 left, you know, so...

**Q. Do you know if there's any sort of instrument or testing to determine the amount of granular loss?**

A. I do not.

**Q. And --**

A. It's more of a visual thing.

**Q. Yes, sir. And, again, don't let me cut you off. I'm bad about that.**

A. You're good.

**Q. Are you able to quantify the impact or the functionality or lifespan of the roof because of the granule loss?**

A. Well, just when you have excessive granule loss and then you try to do a repair, you're going to cause even more, which is going to expose even more of the matting and all, and it just -- it just -- it reduces the amount of protection that the shingle -- you know, it's -- and it show --

Anyway. It can cause leaking if too much of the fiberglass matting is showing.

Water can actually seep through it.

**Q. All right. Are you able to provide a definitive amount to -- you know, this will take two years off the life of the roof or five years, or do you have a quantifiable sum like that?**

A. I do not.

**Q. We see here under the same section, it notes that there was 100 plus shingles damaged; is that correct?**

A. Yes. There was a -- there was a significant amount of singles that were creased, damaged, missing. I didn't -- I quit counting at about -- at about 75, and so that's why I said a hundred plus there on that.

**Q. When you say "counting," what sort of inspection or testing were you doing?**

A. It was just a visual testing, looking just from stuff you could see with the naked eye.

**Q. And the --**

A. There was -- there was tarps. There was -- I guess at some point, there was a bunch of tarps on it, but they had been on there so long that they were tattered and missing, and

you could just see just missing shingles, exposed -- not exposed decking, but exposed underlayment, and some decking was from where the underlayment was missing as well. But it was mainly just a visual.

**Q. And to confirm, you said -- you said there was some exposed decking?**

A. Yeah. Some. Just -- I mean, not a lot, but just like where some of the -- because this roof had the -- the old style, like, tar paper. So it was just little pieces, and you could see some decking and some bareness. Not a lot, but there was some showing.

**Q. Are you familiar with the square test method?**

A. You mean like the grid --

**Q. The test square --**

A. -- where you do, like, a 10-by-10 area?

**Q. Yes, sir.**

A. Yes. I don't -- I only do that on, like, hail, though. That's the only time I use, like, the 10-by-10 area is like if I want to grid out for however many hail strikes. But I wasn't there to do that.

**Q. All right. Scrolling down here, we see**

**the -- or do you see the section titled rebair -- "Repairability Assessment Observations"?**

A. I do.

**Q. There are a couple things I'd like to go over here. First is nail pull-through. And in layman's terms, can you explain that to me?**

A. So in order to get -- so you have your target shingle. So you have your -- your creased or damaged shingle, whatever, that you want to remove. In order to get that out, you have to -- pull the nails out.

So you go -- you -- you separate your seal, and you lift it up. You see where your placement of your nails are, right, and then you take your pry bar, and you go under the shingle, and you try to -- if it's a good shingle or if it's not, you know, too old or whatever, you can lift up on it, and the nail will come out, and it will not tear through the single. And so that's what a nail pull-through is.

So whenever I tried to get up under there to -- to get the nail up, the shingle was so thin and old or whatever, it just -- it just pulled through the nail. Either that or from

improper installation. Probably could have been over-nailed. You know, they didn't have their nail gun set right, and it drove the nail too deep, and so they just pull through. And when it does that, it actually tears through the matting and all.

**Q. Is there a way you're able to tell whether it was over-nailed versus just over-shingled?**

A. I mean, no. Not really.

**Q. You mentioned some of the, I guess, methods or tool you -- tools you used. What -- do you recall the tools you used on this inspection?**

A. Yes. So I usually -- on my inspections, I keep like a six-inch -- like a putty knife. I have, like, the flat bars, you know, that -- pull a nail with. So I have a long one that'll reach all the way through. So I use that to get the nails up with. And then I also had a little bitty -- a little small flat bar that's only about maybe five inches long, and that's usually what I use to separate the seals. But I use the -- the flat bar, the bigger flat bar, to slide under the shingle and then use that to pry

the nail up.

So you'll lift it up to get the nail loose a little bit, and then you'll push the shingle back down onto where the nail head's showing. Then you come over the top of it, and you use the end with the -- you know, the hook on it, and then you pull the nail out just so you don't have to lift the shingle up. You know, try to be as gentle as possible during the assessment.

**Q. And when you say "flat bar," are we talking about just, like, a standard pry bar or Roof Snake?**

A. If you want to hold on a second, I can run outside, and I can grab it and show you if that'll be better.

MR. THOMPSON: No. Just describe what you've got. You know, what you're able to do with what you've got. All right?

A. So yeah. It's just like your normal flat bar. You know, it goes like this (demonstrating), and then it's got a -- up here (indicating), and you got to where you can pull a nail this way (indicating) or that way (indicating). You know, just your typical flat

bar what they call it or nail pry bar or whatever.

**Q. I just wanted to confirm if it was a pry bar or flat bar or a Roof Snake. Or are you familiar with a Roof Snake?**

A. I am. I do not like -- I do not like them.

**Q. (Indiscernible.)**

A. They're -- they're technically not even made for -- for an architectural shingle because you have to go under it too far. And when you strike the nail down, it presses the edge of the shingle, and it breaks -- you know, it busts the edge of the shingle up.

**Q. All right. You mentioned some material transfer here. Can you explain that to me in layman's terms?**

A. Yeah. So when you try to -- when you -- when you have two shingles and you have the seal strip -- well, when you have to separate the seal, it will -- if -- you know, over time, they get almost, like, bonded together where it's almost like one piece.

And when you try to separate it, it actually will pull the matting off of either the

back of the top shingle, or it will pull the top of the -- you know, the other shingle, and it'll actually pull a chunk of material out of it and exposes the fiberglass matting, and it just -- it's damages the shingle to the -- you know, it damages the shingle that wasn't there before you started.

**Q. Is it possible to repair surrounding shingles where there has been material transfer?**

A. I mean, not in my opinion because it's a dam -- it's damaged. You know, it wasn't like that before when you started, and it's just not industry practice to, you know -- I guess no.

**Q. Are you aware of any sort of testing or industry practice to quantify the amount of material transfer present?**

A. Been told any of it is bad.

**Q. I see where you mention creasing and hanging. Again, can you explain that in layman's terms to us?**

A. Yeah. So -- and which one was that? That should have been on 7 and 8, right? Yeah. So the way the process works, you have a set amount of shingles. There's eight shingles that you have to manipulate on every -- when you --

to change one shingle out, you have to manipulate eight shingles around it, right? And so 7 and 8 -- let me see. I'm going to pull this out right here, this picture right here. Yeah. Hold on. Hold on now. Go ahead and explain it a little bit better to you.

**Q. And I might be able to assist you. I think I know --**

A. Yeah.

**Q. -- where you're going.**

A. Go back up. Back up. Back up one more.

**Q. (Complies.)**

A. That one. All right. Right there. Can you zoom in on that?

**Q. (Complies.)**

A. Okay. All right. So your "X" is your target shingle, right? The reason why you're marking 1 and 2 is because when you separate the seal on that target shingle, 3 and 4, you're looking for material transfer on 1 and 2. So you're either going to have material come from the target shingle, or 4, 3 on -- and it's left on top of 1 and 2, or it's going to be opposite. You're going to tear a chunk out of 1 or 2, and it's going to be on the back of them.

All right. So when you pull the nails out of -- you have to get the -- to get the nail -- all of nails out of the target shingle. There's two nails -- or there's nails under 6 and 5, right, and there's also nails on the -- because you have two rows of nails that gets every shingle. So there's another nail from when you nail down single -- shingle 6 and 5, so they're up under 7 and 8, right?

Well, when you -- so you've taken all of the nails out of 5 and 6. So when you pick it up to put a nail back in those two right there, you don't have to lift them up. I mean there's -- they -- they move a lot more, right? Well, you're not pulling any nails out of 7 and 8, so it doesn't give you very much room to lift it up, or it doesn't have as much motion -- room of mo -- range of motion there without, you know, creasing there.

So you have to pick it up high enough to get a sold strike on your nail to put the nail back in 5 and 6 right there. And so what happens is a lot of times it'll separate. It'll delaminate the teeth or the laminates, or it will crease along the top right there between

the top of the shingle and above that. Just about always 7 and 8 on an older roof like this, they'll hinge real bad on you right there because you have to pick it up.

I mean, even if you don't pick it up past a 45, it still creases that one there because it's -- it doesn't have very much -- you know, you only got like five inches showing, so it -- it just -- you'll have creases really bad right there.

**Q. And, again, one of those lawyer questions. When you say "creases," what are you referring to?**

A. So it's like -- it's -- if you pick it up and it's -- it's like folding a piece of paper, right? You have a crease right here. That's what it looks like. But in -- under a microscope or whatever, it would look -- you would see the fiberglass matting would -- the fiberglass would be broken in there. So if you -- you know, it could cause water seepage through there if left -- you know, if you -- if it's creased, it can eventually cause a leak.

**Q. All right. And we talked about some ranges. I think you mentioned it during the --**

**past 45. Is there a certain degree used in testing in order to determine whether it's susceptible to creasing or hinging?**

A. Not that I know of. I just know you try to keep it less than that 45-degree angle if possible. But sometimes you just can't do it in order to get a good -- you know, a good square hit on your nail. You have to pick it up high enough to kind of go up under that shingle that you're lifting up.

So if the shingle, you know, is still good and pliable, a lot of times you can -- you can do it. But if it's old and been there -- you know, 20 years old or whatever, you know, they get rally hard and brittle. And so, I mean, just picking it up even 30 degrees sometimes will crease it.

**Q. All right. And for the purposes of our conversation, I see here this is -- we're referencing a photograph that says page 12 of 54 on the bottle right-hand corner as -- designated as Chiang 366. Go back up to the top here. Bear with me.**

**All right. I see for Shingle Number 7 we're seeing applique delamination if I'm not**

**butchering that word. Can you explain that to us?**

A. I guess that's the word. I don't know. So what that is, is like I said, the tooth or where it's laminated together, you've got the -- the little small -- it looks like little teeth or whatever on it. Those will -- like, so when you pick it up, like, you have to look at my screen right here. So when you pick it up, that laminate that's on there, it'll do like that (demonstrating), and it'll crease. So it won't flex up. It'll do like that (demonstrating), and that's -- it'll -- it'll crease right there, and it delaminates because they're actually glued together. And when it gets delaminated, it'll pop loose right there (demonstrating).

So that's what -- the reason why I put that on there. That's what happened on it. And I -- I couldn't remember if I -- I think I took a picture of it but... Anyway.

**Q. All right. Moving on to the next page under "Additional Assessment Factors: General Conditions by Type." I see just by where it says "Total," there is visual incompatibility. Can you explain that for me?**

A. Just because of how terrible condition it was, I guess that's what I was using on that. I don't know that any other shingle would be incompatible. I was -- and that's probably -- maybe I misinterpreted that one. But it -- just because of the condition of the roof is why I was saying that it was visually incompatible.

I mean, this roof is in terrible shape. Terrible, terrible shape. This -- we should not even be here. Like, it was poor handling at the beginning of documentation is why we're sitting here.

**Q. Well, and we'll definitely get there. We will talk about that.**

**All right. Again, on the bottom of our fourth page here, it says under "Final Determination: Repairability is limited, and localized repair is not recommended."**

**Where it says "repairability is limited," are you -- is it your contention that this roof is incapable of being repaired, or it would be difficult, or how would you quantify that?**

A. I mean, I don't think it's repairable at all for one because you're going to cause so

much damage around every shingle that you try to change that -- all that creasing and all the delamination and all of the nail pull-throughs. I mean, the area that you change will be fine, but it's going to leak. It may not leak tomorrow or -- you know, what I mean? But it might leak a week, two weeks, or a month from now. But it is going to cause problems around that -- around that repair that you do. So that's why I say that it's, you know, localized -- doing a localized repair, like, which means a small area or whatever, would not -- it's just -- it wouldn't work.

**Q. All right. Anything else? I don't want to cut you off.**

A. Good. Yeah.

**Q. All right.**

A. I was done.

**Q. And, again, I think you touched on this earlier, but to go a little bit further. Have you worked with insurance companies on roof repairs or replacements before?**

A. Yes.

**Q. What sort of evidence do you provide to them in order to support your position?**

A. So most of the time when I go in, the first thing I do is I'm going to do a -- you know, an inspection. I'm going to -- I pretty much do exactly what an insurance adjuster does. I go in. I mark it up. I -- you know, I document all the damage. You know, hundreds of photos, you know, and then just -- and then I'll do my -- I do any own assessment.

And honestly, I -- I mean, if -- look. If I -- if a roof is not repairable, then I do this. You know, some roofs are repairable, you know. And if they are, I mean, there's no need in trying to fight it. So, you know, I just kind of -- I base it off of the condition of the roof how I approach a -- you know, how I approach -- approach the claim. I mean --

MR. THOMPSON: Counsel?

THE WITNESS: Do what?

MR. THOMPSON: I don't mean to cut you off. I'm sorry. Finish your response. I was about to --

THE WITNESS: I was pretty much done with it. No. I'm good.

MR. THOMPSON: Okay.

THE WITNESS: Did you need to say

something?

MR. THOMPSON: I was going -- I was just going to ask for a quick bathroom break.

MR. DAY: Sure thing. Off the record.

(A recess was taken.)

MR. DAY: All right. We should have just a little bit left. Not much.

All right. Ready to go back on the record?

(All parties agree.)

**Q. (By Mr. Day) Okay. I think we left off -- I'd asked you the question, you know, have you worked with insurance companies, and I maybe asked you what sort of things you do. You mentioned inspect them, mark them up, provide your own assessment. Is that a fair characterization of what you said?**

A. Yes. But I don't do a repairability assessment unless -- unless I'm asked or needed to. You know, that's not, like, the first thing I do.

**Q. Have you ever had --**

A. Because it is a destructive test, you

know. You don't always -- you know, you can't -- don't need to always do that.

**Q. Have you had any cases where you've had to provide additional or supplemental information to the insurance companies?**

A. Like they come back and want more information from me?

**Q. Yes, sir.**

A. Yeah.

**Q. What sort of information do you typically provide to them?**

A. Sometimes --

MR. THOMPSON: Objection to form.

A. -- they just want more photos or -- or sometimes they want you to -- to actually try to attempt to repair where they actually provide -- you know, like I said, they send a shingle off to ITEL or whatever, NTS or whatever and get a -- they tell you what shingle and brand and color they want you to use, and then I would go out and -- you know, if -- if -- if they say it is repair -- you know, if we say it's repairable, even sometimes if it's repairable, it still -- it still can't -- you still end up replacing the whole roof because of reasonable

appearance, you know. I know it doesn't have to match here in Georgia, but it does have to -- it does have to look good, you know. You can't put patches all over a roof where it looks like a checkerboard up there with -- you know, so that's a lot of it is just going back and actually changing some shingles out and showing how bad it looks.

**Q. Do you have any education or certification in dealing with the insurance process?**

A. No. Just what I've learned over -- from experience.

**Q. And, again, one of those attorneys questions. Are you licensed as an insurance adjuster?**

A. I am not.

**Q. We talked earlier about some decking. Do you know in Georgia is it required that decking be replaced or reset when shingles are repaired or replaced?**

A. It's not unless it's damaged from -- you know, like if it -- if the exposed area from whatever and it damaged the decking, then you would have to replace it then, but it's not

required to just do it because it was exposed.

**Q. And, for this roof, do you believe replacing or resetting the decking is warranted?**

A. No. Not from what I've seen, you know. Now, if you -- once -- if you tore the roof off and you see it, then yes, there may be some damaged decking in there, but not from what I could just see from what was exposed. I didn't -- it didn't look too bad.

**Q. Earlier you had mentioned that there were some issues in handling this claim; is that correct?**

A. Well, I just -- I don't know. That was just my own opinion, but I have no idea how this claim was handled. You know -- I mean, I don't know what them guys done or -- or whatever.

**Q. Well, let's go -- what was your opinion based on?**

A. My opinion was based on my assessment and the -- just the -- the condition from visuals and -- and my assessment.

**Q. Have you read any claim file materials or discussed the claim handling process with anybody concerning this claim?**

A. I have not.

**Q. Thank you. I'll ask generally. Is there any information about the roof that you feel is important I should know that I haven't asked you any questions about today?**

MR. THOMPSON: Objection to form. You can respond.

THE WITNESS: What?

MR. DAY: He just --

(Simultaneous speakers.)

A. I mean, yeah. I mean, when I got there, there was -- like I said, it was shingles missing everywhere. It was just in terrible shape. And, I mean, that's it. I mean, anybody could have -- anybody could tell that this thing was in bad shape. You know what I mean?

**Q. All right. I think that's all I have for you at this time. I'll ask, have you understood all my questions today?**

A. I have.

**Q. And do you need me to go back and repeat or rephrase anything for you?**

A. (No response.)

**Q. That was a no?**

A. No, sir. Yeah.

MR. DAY: Mr. Thompson may have

some follow-ups here for you.

EXAMINATION

BY MR. THOMPSON:

**Q. Mr. Melton, did you record a video of your repairability assessment?**

A. I did. I believe he asked that already.

**Q. Right. And the video -- give me one second. I'm going to mark it as Plaintiffs' Exhibit 1.**

(Plaintiffs' Exhibit Number 1 was marked for identification.)

**Q. I'm going to share my screen. Let me know when you can see my screen. One second.**

**Okay. Do you recognize what I'm showing you as Plaintiffs' Exhibit 1, this 21-minute-and 3-second video?**

A. I do.

**Q. Okay. Is this the video that you took of your repairability assessment of the Chiang residence?**

A. It is.

**Q. Okay.**

MR. THOMPSON: All right. I don't have any additional questions at this time. We will read the transcript.

MR. DAY: All right. Nothing further.

(The deposition of WILLIAM MELTON was concluded at 1:07 p.m. Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e), signature of the witness has been reserved.)

MR. DAY: And we'll take an e-tran at this time.

THE STENOGRAPHER: You got it. And I'll go ahead and get that e-tran to you, Kai.

MR. THOMPSON: Okay. Thank you.

--oOo--

CERTIFICATE

STATE OF GEORGIA

COUNTY OF DEKALB:

I hereby certify that the foregoing transcript was reported, as stated in the caption, and the questions and the answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the employ of counsel for any of said parties; nor am I in any way interested in the result of said case.

This the 9th of July, 2026.




Cert. No.: 5942-2349-4227-5584

Rachel E. Tucker, CCR
GA 5942-2349-4227-5584

DISCLOSURE OF NO CONTRACT

I, Rachel E. Tucker, Certified Court Reporter, do hereby disclose pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that I am a Georgia Certified Court Reporter; Gallo Legal Services, LLC, was contacted by the party taking the proceeding to provide court reporting services for this proceeding; Gallo Legal Services, LLC, will not be taking this proceeding under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and Gallo Legal Services, LLC, is not disqualified for a relationship of interest under O.C.G.A. 9-11-28(c).

There is no contract to provide reporting services between Gallo Legal Services, LLC, or any person with whom they have a principal and agency relationship nor any attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond Gallo Legal Services, LLC's, usual and customary rates have been disclosed and offered to all parties.

Cert. No.: 5942-2349-4227-5584

Rachel E. Tucker, CCR
GA 5942-2349-4227-5584 2

CASE: Ven Chiang and Maria Chiang vs State Farm Fire and Casualty Company

NAME OF WITNESS: William Melton

The preceding deposition was taken in the matter, on the date and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the deponent will read and sign the transcript of said deposition. Said jurat is to be returned, within 30 days after the transcript is made available, to the following address/e-mail:

Gallo Legal Services - Production Dept.
2900 Chamblee Tucker Road, Building 13
Atlanta, Georgia 30341
Production@Gallo.Legal

If an errata is executed and returned to GLS within the 30 days allocated by law, the executed errata will be sent to the taking attorney for filing with the original transcript. Should an executed errata not be forwarded from GLS to the taking attorney for filing, the deposition was not reviewed and signed by the deponent within 30 days.

NAME OF CASE: Ven Chiang and Maria Chiang vs State Farm Fire and Casualty Company
DATE OF DEPOSITION: 07/01/2026
NAME OF WITNESS: William Melton

GLS JOB NO.: 140405

CERTIFICATE

Before me this day personally appeared WILLIAM MELTON, who, being duly sworn, states that the foregoing transcript of his/her deposition, taken in the matter, on the date and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

__________________________

WILLIAM MELTON

SUBSCRIBED and SWORN to before me

this __________ day of _____________ 20____.

in the jurisdiction aforesaid.

____________________ ___________________
My Commission Expires Notary Public

STATE OF ___________________________

COUNTY/CITY OF ______________________

[] No changes made to the Errata Sheet; therefore, I am returning only this signed, notarized certificate.

[] I am returning this signed, notarized certificate and Errata Sheet with changes noted.

Errata Sheet

NAME OF CASE: Ven Chiang and Maria Chiang vs State Farm Fire and Casualty Company

DATE OF DEPOSITION: 07/01/2026

NAME OF WITNESS: William Melton

Reason Codes: 1. To clarify the record

2. To correct transcription errors

3. Other

______________________________________________
______________________________________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

SIGNATURE:_______________________DATE:_______

William Melton

Errata Sheet

NAME OF CASE: Ven Chiang and Maria Chiang vs State Farm Fire and Casualty Company

DATE OF DEPOSITION: 07/01/2026

NAME OF WITNESS: William Melton

Reason Codes: 1. To clarify the record

2. To correct transcription errors

3. Other

______________________________________________
______________________________________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

SIGNATURE:_______________________DATE:_______

William Melton

### Exhibits

**Defendant's Exhibit 1** 3:10,18 11:21,22 21:8, 23

**Defendant's Exhibit 2** 3:11 21:9,10,24 26:8,9

**Defendant's Exhibit 3** 3:12 29:3,4

**Plaintiff's Exhibit 1** 3:15 51:10

**Exhibit Binder** 3:8

### -

**--ooo--** 52:16

### 1

**1** 11:21,22 21:8,23 38:18,20,23,24 51:9,10, 15

**10** 16:18

**10-by-10** 32:18,22

**100** 31:9

**100,000** 30:3

**11** 16:19

**12** 41:20

**15** 28:4

**15-year** 28:8

**1732** 12:15

**1:07** 52:4

**1st** 4:1

### 2

**2** 21:9,10,24 26:9 38:18, 20,23,24

**2/23/79** 9:22

**20** 28:4 41:14

**2026** 4:1

**21-minute-and** 51:15

### 3

**3** 29:3,4 38:19,22

**3-second** 51:16

**30** 41:16

**30(e)** 52:5

**30-year** 28:8

**31601** 12:16

**366** 41:22

### 4

**4** 38:19,22

**45** 40:6 41:1

**45-degree** 41:5

### 5

**5** 39:5,8,11,22

**54** 41:20

### 6

**6** 39:4,8,11,22

### 7

**7** 37:22 38:3 39:9,15 40:2 41:24

**75** 31:14

### 8

**8** 37:22 38:3 39:9,16 40:2

### 9

**9-11-30(e)** 52:7

**90** 26:3

**90-something** 26:3

### A

**ability** 8:23 9:4

**abode** 8:11

**action** 10:6

**actual** 15:11 18:6 19:3, 6 22:21 23:11 26:16,17

**additional** 10:25 19:24 42:22 47:4 51:24

**Additionally** 6:5,15,21 7:11 8:4,16

**address** 12:13 20:1

**adjuster** 45:4 48:16

**adjusters** 20:22

**affirmed** 4:5

**afternoon** 4:8

**agents** 20:13

**agree** 4:14 46:12

**agreeable** 7:18

**Agreed** 4:19

**agreement** 4:11

**ahead** 38:5 52:13

**Alabama** 16:9

**alcohol** 8:22

**allowed** 4:12

**amount** 30:6,21 31:3, 12 37:15,24

**and/or** 52:7

**angle** 41:5

**answers** 5:15 28:14

**appearance** 48:1

**applique** 41:25

**approach** 45:15,16

**April** 13:1

**architect** 27:10

**architectural** 27:13, 19,22 36:10

**area** 6:13 16:2,6 20:14 32:18,22 44:4,12 48:23

**aspect** 14:11 15:1

**asphalt** 18:7

**assessment** 18:8 21:4 23:19 25:24 26:16 29:11 33:2 35:10 42:22 45:8 46:18,21 49:19,21 51:5,19

**assessments** 18:18 20:20 23:10 24:2

**assessor** 24:3

**assignments** 20:5

**assist** 38:7

**assume** 7:6 11:13

**Atlanta** 16:7 25:11

**attached** 10:23 21:18

**attachment** 21:23

**attempt** 47:16

**attended** 25:9

**attorney** 26:21

**attorneys** 20:17,20,21 48:14

**avoid** 5:17

**aware** 37:14

### B

**back** 15:20,25 17:1 23:1 27:7 28:25 29:20 35:4 37:1 38:11,25 39:12,22 41:22 46:10 47:6 48:6 50:20

**bad** 30:12 37:17 40:3,9 48:8 49:9 50:15

**bald** 29:24

**ballpark** 13:3 17:7

**bar** 33:16 34:21,24 35:11,12,21 36:1,4

**bareness** 32:12

**bars** 34:17

**base** 45:14

**based** 49:18,19
**bathroom** 46:3
**Bear** 41:23
**beginning** 13:1 43:11
**behalf** 4:25
**belonging** 8:7
**big** 6:10 22:12 23:13
**bigger** 34:24
**birth** 9:21
**bit** 5:4 8:1 10:2 17:16 22:7 29:9 35:3 38:6 44:20 46:9
**bitty** 34:21
**board** 25:23
**boards** 23:6,9,13
**bonded** 36:22
**boom** 14:18
**bottle** 41:21
**bottom** 43:15
**brand** 28:12,17 47:19
**break** 7:18 46:4
**breaks** 6:25 36:13
**bring** 10:25 23:8,13
**brittle** 41:15
**broken** 40:20
**brought** 14:25 23:5
**Bryant** 12:11 13:5,14, 18 16:2,15,21
**building** 13:22,23 18:20 22:7 26:24
**bunch** 24:8 31:23
**business** 12:14
**busts** 36:13
**butchering** 42:1

**C**

**call** 6:25 36:1
**called** 20:12
**calling** 16:23
**cars** 14:16
**case** 7:1 21:7
**cases** 47:3
**catch** 18:16
**catching** 9:10,17
**certification** 18:6,21 22:24 24:12 25:13 48:10
**certifications** 14:10 17:17 18:4
**certified** 14:7,13 16:13
**Chad** 22:20
**change** 38:1 44:2,4
**changing** 48:7
**characterization** 46:19
**checkerboard** 48:5
**Chiang** 8:8 41:22 51:19
**chunk** 37:3 38:24
**Civil** 52:6
**claim** 5:2 45:16 49:11, 15,22,23,24
**claims** 15:20
**clarity** 21:21
**class** 22:23 24:21 25:2
**classes** 22:16
**closer** 9:12
**coating** 14:8,9,15
**coatings** 14:14
**coffee** 6:23
**college** 17:20,22,24
**color** 47:20
**colors** 28:17
**Columbus** 16:8
**commercial** 17:12,15
**companies** 13:14,17, 20 44:21 46:15 47:5
**company** 12:10 14:6 15:4,11 17:8
**Complies** 38:12,15
**concluded** 52:4
**condition** 29:22 43:1,6 45:14 49:20
**Conditions** 42:23
**confirm** 8:6 32:6 36:3
**constant** 24:7
**construction** 13:17,20 15:12 18:5,12
**contact** 22:8
**contention** 43:20
**contract** 20:23
**contracts** 15:18
**conversation** 8:14 41:19
**conversational** 5:19
**cool** 23:12
**corner** 41:21
**correct** 8:8 10:10 21:22 31:10 49:12
**correctly** 5:16 6:20
**counsel** 4:11 21:12 45:17
**Counselor** 4:14
**counting** 31:13,16
**couple** 5:1 6:22 16:17 33:5
**coursework** 23:3
**court** 5:13 6:16
**courtesy** 5:24
**crease** 39:25 40:16 41:17 42:11,13
**creased** 31:12 33:10 40:23
**creases** 40:6,9,12
**creasing** 37:18 39:19 41:3 44:2
**cuffs** 6:22
**cups** 6:22
**current** 19:17
**curriculum** 26:8
**cut** 6:3 10:19 30:11 44:15 45:19

**D**

**dam** 37:11
**damage** 44:1 45:6
**damaged** 23:11 31:9, 13 33:10 37:11 48:22, 24 49:7
**damages** 23:19 37:5,6
**date** 9:21 12:21 28:2
**day** 4:7,20,22,24 11:18, 20 15:22,25 16:1 21:15, 21 22:1,3 23:16 24:13, 14 26:4,7 46:5,8,13 50:8,25 52:1,10
**days** 13:24
**dealing** 48:10
**decided** 15:5
**decking** 32:2,3,7,12 48:18,20,24 49:3,7
**deep** 34:4
**defendant** 4:25
**defendant's** 11:21,22 21:8,9,10 29:3,4
**definitive** 31:3
**degree** 41:1
**degrees** 41:16
**delaminate** 39:24
**delaminated** 42:15
**delaminates** 42:14
**delamination** 41:25 44:3
**demonstrating** 35:22 42:11,12,16
**deposition** 4:1,9,17 5:8,12 8:5 52:3

**describe** 22:3 26:13 27:9 35:17
**designated** 41:21
**designating** 6:14
**desktop** 9:14
**destructive** 46:25
**detailed** 22:14
**Determination** 43:17
**determine** 29:16 30:6 41:2
**difficult** 43:22
**discovery** 11:17
**discussed** 49:23
**discussion** 15:24
**document** 10:7,8,21, 23 18:24 22:4 26:14 29:2 45:6
**documentation** 11:1 43:11
**documents** 10:24 11:8 14:22 19:12,14
**DOT** 14:16
**Dow** 12:15
**drove** 34:3
**duly** 4:4
**dwelling** 8:11

**E**

**e-tran** 52:10,13
**earlier** 12:18 17:16 44:20 48:18 49:10
**edge** 36:12,14
**educate** 19:16
**education** 17:19 19:25 48:9
**email** 27:1,6
**employed** 12:7,9
**employees** 16:14
**end** 8:2 15:20 35:6 47:24
**engineer** 22:21
**entered** 20:23
**eventually** 40:23
**everything's** 27:5
**evidence** 4:13 44:24
**exact** 12:21 28:2
**exam** 25:12
**EXAMINATION** 4:21 51:2
**examined** 4:5
**excessive** 29:15,16 30:17
**Exhibit** 11:21,22 21:8, 9,10,18,23,24 26:8 29:3,4 51:9,10,15
**experience** 15:7 18:9 24:20 48:13
**Expert** 18:20 22:8
**explain** 33:7 36:16 37:19 38:6 42:1,25
**expose** 30:20
**exposed** 32:2,7 48:23 49:1,8
**exposes** 37:4
**eye** 31:20

**F**

**Facebook** 22:11
**fact** 20:14
**Factors** 42:22
**fair** 7:6,9 46:18
**familiar** 32:14 36:5
**Farm** 20:14 28:19
**farther** 29:19
**fast** 7:1
**Federal** 4:12,13 52:6
**feel** 23:17 50:3
**fell** 15:6
**fiberglass** 29:25 30:25 37:4 40:19,20
**field** 20:1
**fight** 45:13
**file** 49:22
**fill** 26:17
**Final** 43:16
**fine** 13:3 44:4
**Finish** 45:20
**fish** 6:9
**flat** 34:17,21,24 35:11, 21,25 36:4
**flex** 42:12
**Florida** 16:5,9,10,12
**folding** 40:15
**follow** 6:11
**follow-ups** 51:1
**forgiving** 12:22
**form** 4:15 26:17 47:13 50:5
**forward** 10:22
**fourth** 43:16
**friend** 15:3
**front** 12:5 17:1 26:19
**full** 9:19 24:13
**fully** 5:22 6:4 8:19,24 9:5
**functionality** 30:15

**G**

**general** 27:10 29:21 42:22
**generally** 12:21 17:18 50:1
**gentle** 35:9
**geographical** 16:2
**Georgia** 12:11,16 16:4 24:23 25:2,6,9,11 48:2, 19
**Gestures** 6:10
**get almost** 36:22
**give** 15:5 22:15 27:23, 24 29:21 39:16 51:7
**glued** 42:15
**good** 4:7,8,23 23:17 30:13 33:17 41:7,12 44:16 45:23 48:3
**Google** 20:11
**grab** 35:15
**graduate** 17:25
**granular** 29:15,16 30:7
**granule** 30:16,18
**granules** 30:2
**grid** 32:16,23
**groups** 22:11
**guess** 11:7 21:22 23:7, 25 24:5 27:23 31:23 34:11 37:13 42:3 43:2
**guessing** 12:24
**guidelines** 18:19 19:1
**gun** 34:3
**guy** 22:19
**guys** 22:12,18 49:16

**H**

**hail** 32:21,23
**handled** 49:15
**handling** 43:10 49:11, 23
**hands-on** 18:8 23:5 25:24
**hanging** 37:19
**happened** 42:18
**happy** 7:2
**hard** 41:15
**Hazardous** 14:24

**head** 6:8 7:19 16:20 19:6 20:2
**head's** 35:4
**hear** 6:23 7:21 9:15 18:14,15
**held** 13:8
**Hey** 26:4
**high** 39:20 41:8
**high-pressure** 14:15
**highest** 17:18
**hinge** 40:3
**hinging** 41:3
**hit** 41:8
**hold** 18:5 35:14 38:5
**holds** 12:4
**home** 8:11
**honestly** 45:9
**hook** 35:6
**hoping** 27:12
**housekeeping** 5:11
**houses** 23:6
**hundred** 17:10 31:15
**hundreds** 45:6

**I**

**idea** 17:3 29:21 49:14
**identification** 11:23 21:11 29:5 51:11
**impact** 30:14
**impair** 8:23 9:4
**impairments** 8:17
**important** 14:21 50:3
**improper** 34:1
**incapable** 43:21
**inches** 34:22 40:8
**included** 19:14
**incompatibility** 42:24
**incompatible** 43:4,7
**indicating** 6:10 35:23, 24,25
**Indiscernible** 36:8
**industry** 19:1,17 24:18 37:13,15
**influence** 8:21
**information** 27:1 47:5, 7,10 50:2
**inspect** 46:17
**inspected** 17:5 29:6
**inspection** 8:7 11:11 14:3,4 15:7 31:17 34:14 45:3
**inspections** 14:9,13 15:17 34:15
**installation** 34:1
**Institute** 18:20 22:8
**Institute's** 26:25
**institution** 24:22
**instrument** 30:6
**insurance** 20:12,13,22 44:21 45:4 46:15 47:5 48:10,15
**interest** 10:21
**interior** 14:15
**interject** 19:10
**Internet** 19:22
**involved** 5:1
**issues** 49:11
**ITEL** 28:23 47:18

**J**

**January** 23:1
**Jr** 4:10 9:20
**July** 4:1
**jury** 12:5

**K**

**Kai** 10:10 11:12 52:14
**kind** 13:11 14:4 15:2,6, 8 23:18,20 24:5,15,17 28:25 29:17 41:9 45:14
**kinds** 14:7
**knife** 34:16
**knowledgeable** 22:17

**L**

**laminate** 27:20 42:10
**laminated** 27:22 42:5
**laminates** 39:24
**lawyer** 5:5 40:11
**layman's** 27:18 33:7 36:17 37:20
**leads** 20:7
**leak** 40:23 44:5,7
**leaking** 30:24
**learned** 48:12
**leave** 28:11
**left** 30:3 38:22 40:22 46:9,13
**legs** 7:13
**level** 17:18
**license** 16:12
**licensed** 48:15
**licenses** 18:10
**life** 31:4
**lifespan** 30:15
**lift** 33:14,19 35:2,8 39:13,16
**lifting** 41:10
**limited** 43:17,20
**list** 10:24 20:16
**literally** 29:24
**localized** 43:18 44:11
**Location** 29:11
**long** 7:12 13:1,4 24:11, 14 31:25 34:18,22
**looked** 28:3,19
**loose** 35:3 42:16
**loss** 29:15,16 30:7,16, 18
**lot** 13:23 14:12 20:13 22:11 23:4,5 32:8,12 39:14,23 41:12 48:6

**M**

**Macon** 16:6
**made** 26:2 36:10
**main** 13:11 15:8
**make** 5:2,11,15 6:4,13, 19 12:22 27:5
**makes** 14:18
**making** 11:18
**man** 14:17
**manager** 12:12 13:9, 10,12 15:10 16:18
**managers** 16:17
**manipulate** 37:25 38:2
**manuals** 19:1
**mark** 11:20 21:7 26:8 45:5 46:17 51:8
**marked** 11:23 21:11 29:5 51:11
**marking** 38:18
**match** 48:2
**material** 14:24 23:2 36:15 37:3,9,16 38:20, 21
**materials** 15:19 49:22
**Matter** 20:14
**matters** 5:11
**Matthew** 4:24
**matting** 30:20,25 34:6 36:25 37:4 40:19

**means** 44:12

**meant** 12:17

**medication** 8:22 9:2

**Melton** 4:1,3,10,23 5:25 9:20 51:4 52:3

**mention** 37:18

**mentioned** 15:10 21:6 34:11 36:15 40:25 46:17 49:10

**method** 32:15

**methodical** 23:22

**methods** 34:12

**mic** 7:25 9:13

**Michael** 4:9 9:20

**microscope** 40:18

**middleman** 16:23

**million** 30:2

**mine** 15:3

**misinterpreted** 43:5

**missing** 31:13,25 32:1, 4 50:12

**mo** 39:18

**month** 44:7

**morning** 4:7,23

**motion** 39:17,18

**mouse** 29:10

**mouth** 20:11

**move** 5:25 39:14

**moved** 14:3

**moving** 29:8,10 42:21

**multiple** 23:15

**mumbling** 6:25

**N**

**nail** 33:6,19,21,23,25 34:3,18 35:1,2,4,7,24 36:1,12 39:3,7,8,12,21 41:8 44:3

**nails** 33:12,15 34:20 39:1,3,4,5,6,11,15

**naked** 31:19

**name's** 14:21

**nationwide** 24:25

**needed** 25:25 46:21

**newest** 19:23

**nice** 9:18

**nods** 6:8 7:19

**nondestructive** 14:8

**normal** 35:20

**note** 21:9 22:1

**noted** 29:14

**notes** 29:12 31:9

**notice** 4:10

**noting** 29:2

**NTS** 47:18

**number** 11:21,22 12:20 21:8,9,10 26:9 29:3,4 41:24 51:10

**O**

**O.C.G.A.** 52:7

**oath** 12:1

**Objection** 47:13 50:5

**objections** 4:15

**Observations** 33:3

**obtained** 18:21

**obvious** 29:18

**occur** 23:19

**office** 16:6,18

**older** 28:5 40:2

**one-day** 24:15

**online** 26:24

**opinion** 5:3 27:15 37:10 49:14,17,19

**opinions** 20:19

**opportunity** 5:22

**opposite** 38:23

**order** 15:19 33:8,11 41:2,7 44:25

**ordinarily** 9:3

**over-nailed** 34:2,8

**over-shingled** 34:9

**oversee** 15:18

**owner** 16:18

**owners** 20:24

**P**

**p.m.** 52:4

**paper** 32:10 40:16

**papers** 19:2

**part** 11:16 25:21

**parties** 46:12

**pass** 26:1

**past** 40:6 41:1

**patches** 48:4

**people** 25:1

**perform** 8:6

**person** 24:9

**personally** 17:8

**pertaining** 18:5

**photograph** 41:20

**photos** 11:3 29:19 45:7 47:14

**pick** 6:18 28:20,21 39:11,20 40:4,5,14 41:8 42:8,9

**picking** 41:16

**picture** 38:4 42:20

**pictures** 29:20

**piece** 27:21 36:23 40:15

**pieces** 27:22 32:11

**pipeline** 13:23

**pipelining** 13:19

**placement** 33:15

**plaintiffs'** 51:8,10,15

**pliable** 41:12

**point** 6:2,15,24 7:13 12:19 31:23

**pointed** 23:18

**Pointing** 6:9

**poor** 43:10

**pop** 42:16

**position** 13:9,25 16:24 44:25

**practical** 25:15,22

**practice** 4:12 18:22 19:6,9 22:22 23:22 25:5 37:13,15

**practices** 19:17,20 20:4

**preface** 20:19

**preferred** 20:15

**prepare** 26:21,24

**presence** 22:12

**present** 37:16

**presses** 36:12

**pretty** 5:19 10:15 11:3 12:22 14:21 16:7 23:11 24:24 45:3,22

**prevent** 8:17

**previously** 21:6

**printed** 26:18

**problem** 8:3

**problems** 44:8

**Procedure** 52:6

**process** 23:17,21 37:23 48:11 49:23

**produced** 11:16,19

**products** 19:19

**professional** 22:18

**program** 23:3 24:23

**programs** 19:25
**project** 13:10 16:17
**projects** 15:19 17:3
**properly** 6:14
**property** 8:6,7,11 20:24 29:6
**protection** 30:22
**provide** 16:21 31:2 44:24 46:17 47:4,11,16
**provided** 11:9,25 19:12,14
**Providing** 20:19
**pry** 33:16 34:25 35:12 36:1,3
**publications** 19:1
**pull** 26:25 33:12 34:4, 18 35:7,23 36:25 37:1,3 38:3 39:1
**pull-through** 33:6,21
**pull-throughs** 44:3
**pulled** 33:25
**pulling** 39:15
**purposes** 4:11 8:13 41:18
**pursuant** 4:10 11:25 52:5
**push** 35:3
**pushing** 17:14
**put** 20:15 39:12,21 42:17 48:3
**putting** 14:1
**putty** 34:16

**Q**

**qualifications** 18:11
**qualify** 12:23 13:2
**quantifiable** 31:5
**quantify** 29:15 30:14 37:15 43:22
**question** 4:16 5:5,6,22 6:1,25 7:4,16,17 28:15 46:14
**questions** 5:1,6,14,20 7:5,8 8:18,24 9:4 26:21 40:12 48:15 50:4,18 51:24
**quick** 46:3
**quit** 31:13

**R**

**railroad** 14:6,10
**rally** 41:15
**ran** 22:20
**range** 39:18
**ranges** 40:25
**rating** 28:6,9
**reach** 34:19
**reached** 22:15
**read** 49:22 51:25
**reading** 19:21
**Ready** 46:10
**real** 40:3
**reason** 38:17 42:17
**reasonable** 47:25
**reasons** 15:8
**rebair** 33:2
**recall** 12:19,25 16:19 25:25 34:13
**recess** 46:7
**recognize** 51:14
**recommended** 43:18
**record** 8:14 15:23,24, 25 46:6,11 51:4
**reduces** 30:21
**reference** 18:19 19:2, 11,12
**referenced** 21:17
**references** 8:10
**referencing** 41:20
**referrals** 20:11
**referring** 6:12 8:5,10, 13 40:13
**related** 14:11
**remember** 19:4,8 25:18,19 42:19
**Remote** 4:1
**remove** 33:11
**rep** 13:10
**repair** 30:18 37:8 43:18 44:9,11 47:16,22
**repair/replacement** 16:22
**repairabilities** 18:7
**repairability** 18:8,18 20:1 23:10 26:15 29:11 33:2 43:17,19 46:20 51:5,19
**repairable** 15:15 43:24 45:10,11 47:23
**repaired** 43:21 48:21
**repairs** 15:12,14,16 18:18 44:22
**repeat** 7:3 50:20
**rephrase** 7:3 50:21
**replace** 48:25
**replaced** 48:20,21
**replacements** 44:22
**replacing** 47:25 49:3
**report** 11:2 26:22 28:23
**reporter** 5:14 6:16
**reports** 11:4
**represent** 10:5,20 29:1
**reps** 16:16
**requested** 10:24
**required** 23:3 48:19 49:1
**reserved** 52:9
**reset** 48:20
**resetting** 49:3
**residence** 51:20
**residential** 13:22 17:11,13
**respond** 5:23 6:4 7:5,8, 17 8:24 9:5 50:6
**responding** 6:2 8:19
**response** 6:19 18:13 45:20 50:22
**responses** 12:23
**responsive** 8:18
**responsiveness** 4:16
**rest** 18:9
**restate** 7:3
**restroom** 7:14
**return** 5:23
**right-hand** 41:21
**rod** 14:1
**rolling** 14:19
**roof** 15:12 20:1 27:8,9, 13,15 28:1,7,9 29:22,25 30:2,15 31:4 32:10 35:13 36:4,5 40:2 43:6, 8,21 44:21 45:10,15 47:25 48:4 49:2,5 50:2
**roofing** 12:10,11 13:5, 14,15,18 15:1,4 16:2, 15,21 18:5,11,17
**roofs** 17:2,4 45:11
**room** 39:16,17
**rows** 39:6
**rude** 6:18
**Rule** 52:5
**Rules** 4:12,13 52:6
**run** 22:12 35:15
**running** 6:22

**S**

**sales** 12:12 13:9,10,12, 25 15:10 16:16,24

**Savannah** 16:8
**scoot** 9:12
**score** 25:25
**scored** 25:17,19
**screen** 9:23,25 21:5,8 26:10,11 42:9 51:12,13
**Scrolling** 32:25
**seal** 33:14 36:19,21 38:19
**seals** 34:23
**section** 29:14 31:8 33:1
**seep** 31:1
**seepage** 40:21
**select** 22:9
**sell** 16:25
**send** 28:21,22 47:17
**separate** 33:13 34:23 36:20,24 38:18 39:23
**service** 16:3
**services** 16:22
**set** 18:23 23:25 34:3 37:23
**shape** 43:8,9 50:13,15
**share** 9:23 21:5,8 26:10 51:12
**shingle** 18:7 27:13,19, 20 28:8,22,25 30:22 33:9,10,16,17,23 34:25 35:4,8 36:10,13,14 37:1,2,5,6 38:1,17,19, 22 39:3,7,8 40:1 41:9, 11,24 43:3 44:1 47:17, 19
**shingles** 23:7,9,11 31:9 32:1 36:19 37:9,24 38:2 48:7,20 50:11
**shot** 15:6
**show** 6:10 10:22 30:23 35:15
**showing** 29:25 30:25 32:13 35:5 40:8 48:7 51:14
**side** 14:3 17:15
**sign** 15:17
**signature** 52:8
**signed** 15:18 22:16
**significant** 31:12
**similar** 28:16
**simultaneous** 9:11 14:23 50:9
**single** 33:20 39:8
**singles** 31:12
**sir** 5:9 7:11,24 8:3,9,20 9:1,16 10:17 11:10,12, 18 13:16 14:25 18:15, 16 20:9 21:1 26:12,20 29:7 30:11 32:19 47:8 50:24
**sirs** 9:7,8
**sitting** 43:11
**six-inch** 34:16
**slide** 34:25
**small** 15:16 34:21 42:6 44:12
**smaller** 15:14
**smart** 22:14
**smoothly** 5:12
**Snake** 35:13 36:4,5
**sold** 39:21
**sort** 18:4,18 23:2 30:5 31:16 37:14 44:24 46:16 47:10
**south** 16:4,7
**speak** 8:1
**speakers** 9:11 14:23 50:9
**speaking** 7:21 9:9
**specific** 11:10 12:20
**specifically** 10:23 18:25 20:6 22:6
**spots** 29:24
**square** 32:14,17 41:7
**stammering** 6:23
**standard** 35:12
**standards** 18:19 19:17
**start** 6:2 9:18
**started** 14:5 29:23 37:7,12
**State** 20:14 28:19
**statements** 13:2
**stay** 19:19,22
**steel** 14:1
**steer** 27:17
**STENOGRAPHER** 52:12
**step** 10:18
**step-by-step** 23:21
**steps** 18:22
**stick** 21:14
**stop** 6:3
**Street** 12:15
**strength** 27:23
**stretch** 7:13
**strike** 36:12 39:21
**strikes** 32:23
**strip** 36:20
**study** 23:2
**stuff** 13:20,23,24 14:9, 16,24 15:20 24:18 31:19
**style** 32:10
**styles** 28:16
**subpoena** 10:6 11:25 21:7,19,22
**substances** 8:22
**sum** 22:5 31:5
**Supplement** 15:20
**supplemental** 47:4
**support** 44:25
**supposed** 27:5 28:22
**surrounding** 37:8
**susceptible** 41:3
**switch** 21:14
**sworn** 4:5

**T**

**taking** 5:14
**talk** 43:14
**talked** 17:16 40:24 48:18
**talking** 5:17 6:6 7:1 27:8 35:12
**tank** 14:16
**tar** 32:10
**target** 33:9 38:17,19,22 39:3
**tarps** 31:22,24
**tattered** 31:25
**tear** 33:20 38:24
**tears** 34:5
**technical** 17:20,24
**technically** 36:9
**teeth** 39:24 42:6
**ten-hour** 24:13
**Tennessee** 25:3,10
**terms** 27:18 33:7 36:17 37:20
**terrible** 5:25 43:1,8,9 50:12
**test** 32:14,17 46:25
**testified** 4:5
**testify** 10:6,11
**testifying** 12:5
**testimony** 11:24 12:4
**testing** 14:8 30:6 31:17,18 37:14 41:2
**tests** 25:17
**texture** 27:25

**that'll** 34:18 35:16

**thin** 33:24

**thing** 5:13 11:5,10 23:21 30:10 45:2 46:5, 22 50:14

**things** 6:7 19:23 23:20, 25 33:5 46:16

**This'll** 21:15

**Thompson** 4:19 6:16 10:11,21 11:15 21:12, 20,25 35:17 45:17,19, 24 46:2 47:13 50:5,25 51:3,23 52:15

**three-dimensional** 27:24

**three-tab** 27:10,21

**ties** 21:3

**time** 6:2,15,24 7:13 9:17 12:19,21 13:3 24:1 26:10 28:24 32:21 36:21 45:1 50:17 51:24 52:11

**times** 23:15 39:23 41:12

**title** 13:8,12

**titled** 33:1

**today** 6:23 7:12 8:19,25 9:5 10:18 11:1 12:1 50:4,18

**today's** 5:12 8:4,14

**toes** 10:18

**told** 10:17 37:17

**tomorrow** 44:6

**tool** 34:12

**tools** 34:12,13

**tooth** 42:4

**top** 16:20 19:5 20:2 35:5 37:1 38:23 39:25 40:1 41:22

**tore** 49:5

**Total** 42:24

**touched** 44:19

**tough** 9:19

**tracks** 14:19

**training** 19:25 25:8

**transcript** 4:18 6:11 51:25

**transfer** 36:16 37:9,16 38:20

**truthfully** 8:25 9:5

**Type** 42:23

**typical** 35:25

**typically** 16:2 47:11

## U

**underlayment** 32:3,4

**understand** 5:3 6:24 7:4 8:23 9:4 11:24 12:3

**understanding** 8:18

**understood** 7:6,9 50:18

## V

**Valdosta** 12:11,15

**variations** 23:24 24:9

**vendor** 20:15

**verb** 7:20

**verbalized** 6:8

**versus** 34:8

**vessels** 14:15

**video** 51:4,7,16,18

**videos** 11:11 23:4

**visual** 30:10 31:18 32:5 42:24

**visually** 43:7

**visuals** 49:21

**vitae** 26:8

## W

**wanted** 15:9 22:6,14 36:3

**warranted** 49:3

**water** 7:14 31:1 40:21

**ways** 5:17

**web** 26:25

**week** 26:5 44:7

**weeks** 44:7

**weight** 12:4

**welding** 13:21,24 14:2, 11,12 18:3

**Where'd** 17:22

**William** 4:1,3,9 9:20 52:3

**Williams** 22:20

**Wiregrass** 17:23,24,25 18:2

**withhold** 4:14

**word** 9:17 20:11 42:1,3

**work** 6:8 12:10 15:5 16:3,10 18:17 20:13 21:15 23:14 44:13

**worked** 13:13,19 14:6 17:4 20:17 44:21 46:15

**working** 13:14 16:11

**works** 37:23

**written** 18:22 19:5,6,9 25:15,20,21

**wrote** 22:21

## Y

**year** 17:4 23:1 28:6

**years** 13:6,7 28:4 31:4, 5 41:14

**younger** 13:24

## Z

**zoom** 6:6,21 10:2 29:9 38:14